IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| WILLIAM B. and MARGARET B., and WILLIAM A.B.,<br><br>Plaintiffs,<br><br>v.<br><br>HORIZON BLUE CROSS BLUE SHIELD of NEW JERSEY and the SANOFI-AVENTIS U.S. LLC GROUP HEALTH & WELFARE PLAN,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (ECF NO. 29) AND GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF NO. 28)**<br><br>Case No.  2:17-cv-01331-EJF<br><br>Magistrate Judge Evelyn J. Furse |

Plaintiffs William B. and Margaret B. ("William and Margaret") and their son William A.B. ("Wills") (collectively the "B. Plaintiffs") and Defendants Horizon Blue Cross Blue Shield of New Jersey ("Horizon") and the Sanofi-Aventis U.S., LLC Group Health and Welfare Plan's (the "Plan") present cross motions for summary judgment.  (Mot. for Summ. J. & Mem. in Supp. ("Pl. Mot. for Summ. J."), ECF No. 29; Defs. Mot. for Summ. J., ECF No. 28.)  On January 7, 2020, the Court[1] heard oral argument.  (ECF No. 56).

The B. Plaintiffs' Complaint asserts a single claim against Horizon and the Plan under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), for recovery of plan benefits under 29 U.S.C. § 1132(a)(1)(B).  (Compl. 11-13, ECF No.

---

[1] The parties consented to proceed before the undersigned Magistrate Judge in accordance with 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73.  (ECF No. 11.)

2.)  The Complaint alleges that Horizon and the Plan improperly denied coverage for Wills' treatment at two residential treatment centers—(1) Elevations Residential Treatment Center/Seven Stars ("Elevations")[2] from December 16, 2015 to January 27, 2016, and (2) Heritage Schools, Inc. ("Heritage") from January 29, 2016 to December 16, 2016.  (See id. ¶¶ 26, 27, 46.)  The B. Plaintiffs claim residential treatment was medically necessary throughout the entire period given Wills' serious mental, emotional, and behavioral problems.  Horizon and the Plan argue, on the other hand, that substantial evidence supports the denial of benefits since Wills could have been safely treated at a lower level of care after December 15, 2015.

As addressed in detail below, having reviewed the parties' briefing and considered their arguments at the January 7 hearing, the Court finds substantial evidence in the record supports the denial of benefits for treatment at both Elevations and Heritage after December 15, 2015.  Accordingly, the Court GRANTS Horizon and the Plan's Motion for Summary Judgment and DENIES the B. Plaintiffs' Motion for Summary Judgment.

## SUMMARY JUDGMENT STANDARD

The Court grants summary judgment when the evidence shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When both parties move for summary judgment in

---

[2] Some of Wills' medical records are from Elevations Residential Treatment Center, while others are from Seven Stars.  The Seven Stars website indicates that "Seven Stars shares the campus and some clinical resources with two nationally recognized residential treatment and assessment centers, [including] Elevations Residential Treatment Center . . . ."  https://discoversevenstars.com/about-us/ (last visited April 10, 2020.)  For consistency, the Court will refer to the center as Elevations.

2

an ERISA case, thereby stipulating that a trial is unnecessary, " 'summary judgment is merely a vehicle for deciding the case; the factual determination of eligibility for benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor.' " Cardoza v. United of Omaha Life Ins. Co., 708 F.3d 1196, 1201 (10th Cir. 2013) (quoting LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan, 605 F.3d 789, 796 (10th Cir. 2010)).

## STANDARD OF REVIEW FOR DENIAL OF BENEFITS

The B. Plaintiffs contend that the Court should review the denials at issue under a de novo standard because the Plan did not delegate authority to Horizon "to construe the terms and provision of the Plan or to determine questions of fact and law arising under the Plan." (Pls.' Opp'n to Defs.' Mot. for Summ. J. & Mem. in Support ("Pls.' Opp'n") 9–11, ECF No. 48; Pls.' Reply to Defs.' Opp'n to Pls.' Mot. for Summ. J. & Mem. in Support ("Pls.' Reply") 9–10, ECF No. 50.) The Plan and Horizon contend that because the Plan grants Horizon discretionary authority to make claims decisions and handle appeals, the arbitrary and capricious standard applies. (Reply Mem. in Supp. of Defs.' Mot. for Summ. J. ("Defs.' Reply") 10, ECF No. 49.)

Courts review a denial of benefits challenged under 29 U.S.C. § 1132(a)(1)(B) using the de novo standard of review unless the plan documents give "the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989) (emphasis added). But where the plan documents give the administrator this discretionary authority, the Court employs a " 'deferential standard of review, asking

only whether the denial of benefits was arbitrary and capricious.' " LaAsmar v. Phelps

Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan, 605

F.3d 789, 796 (10th Cir. 2010) (quoting Weber v. GE Group Life Assurance Co., 541

F.3d 1002, 1010 (10th Cir. 2008)).  The inquiry focuses on who has the authority to

decide the question on which the benefits denial is based.  Hodges v. Life Ins. Co., 920

F.3d 669, 677 (10th Cir. 2019).

The Plan is a self-insured welfare benefit plan.  (Pls.' Mot. for Summ. J.,

Statement of Material Fact No. 2, ECF No. 29; Defs.' Mot. for Summ. J., Undisputed

Material Fact No. 4, ECF No. 28; AR[3] 7, 40.)  The Plan Sponsor and Administrator is

Sanofi-Aventis U.S. LLC.  (Defs.' Mot. for Summ. J., Undisputed Material Fact No. 3,

ECF No. 28; AR 6, 199, 301.)  Horizon serves as the designated Claims Administrator

for the Plan.  (Pls.' Mot. for Summ. J., Statement of Material Fact No. 3, ECF No. 29;

Defs.' Mot. for Summ. J., Undisputed Material Fact No. 5, ECF No. 28; AR 199, 301.)

The Plan provides that

the Plan Administrator has discretion (i) to interpret the terms of the Plan,
(ii) to determine factual questions that arise in the course of administering
the Plan, (iii) to adopt rules and regulations regarding the administration of
the Plan, (iv) to determine the conditions under which benefits become
payable under the Plan and (v) to make any other determinations that the
Plan Administrator believes are necessary and advisable for the
administration of the Plan.  Subject to any applicable claims procedure, any
determination made by the Plan Administrator will be final, conclusive and
binding on all parties.  The Plan Administrator may delegate all or any
portion of its authority to any person or entity.

(Defs.' Mot. for Summ. J., Undisputed Material Fact No. 6, ECF No. 28; AR 22.)  The

applicable Summary Plan Descriptions ("SPD") for 2015 and 2016 state that "the Plan

---

[3] The Joint Administrative Record, cited as "AR" in this decision, is filed under seal at
ECF Nos. 37–44.

has delegated to the Claims Administrator the authority to make final claims determinations and to decide initial and final claims appeals on the Plan's behalf." (Defs.' Mot. for Summ. J., Undisputed Material Fact No. 7, ECF No. 28; AR 199, 301.)

In this case, the benefit denial turned on whether the services at issue were "Medical Necessary" for Wills, as discussed in more detail below.  Generally, the Plan pays benefits when the services are:  (1) performed or prescribed by the member's Provider; (2) provided at the proper level of care; and (3) "Medically Necessary and Appropriate for the diagnosis and treatment of an Illness or Injury."  (Defs.' Mot. for Summ. J., Undisputed Material Fact No. 8, ECF No. 28; AR 141, 244; see also AR 112, 215.)  The Plan defines "Medically Necessary and Appropriate" as:

> a health care service that a health care Provider, exercising his/her prudent clinical judgment, would provide to a Covered Person for the purpose of evaluating, diagnosing or treating an illness, injury, disease or its symptoms and that is:  in accordance with the generally accepted standards of medical practice; clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for the Covered Person's illness, injury or disease; not primarily for the convenience of the Covered Person or the health care Provider; and not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that Covered Person's illness, injury or disease.

> "Generally accepted standards of medical practice", as used above, means standards that are based on:

> a. credible scientific evidence published in peer-reviewed medical literature generally recognized by the relevant medical community;

> b. physician and health care Provider specialty society recommendations;

> c. the views of physicians and health care Providers practicing in relevant clinical areas; and

> d. any other relevant factor as determined by the New Jersey Commissioner of Banking and Insurance by regulation.

5

(Pls.' Mot. for Summ. J., Statement of Material Fact No. 8, ECF No. 29; Defs.' Mot. for Summ. J., Undisputed Material Fact No. 10, ECF No. 28; AR 120, 223.)  This definition does not set forth covered services versus uncovered services.  Rather the definition requires someone to apply the definition to the facts of a particular claim.  The Plan delegated the authority to make that determination to the Case Administrator by delegating "the authority to make final claims determinations and to decide initial and final claims appeals on the Plan's behalf."  (See AR 199, 301.)  The Court finds this delegation qualifies as a delegation of "discretionary authority to determine eligibility for benefits," Firestone, 489 U.S. at 115, which entitles the claims administrator's decisions about medical necessity to arbitrary and capricious review in the absence of other specific concerns.

At the hearing, the parties agreed that the Court should consider the standard of review issue separately as to the Elevations and Heritage claims since Horizon provided separate and distinct denials.  Upon further reflection, separate consideration of the claims for all purposes provides the most intelligible way to decide this case.  Prior to addressing the claims separately, the following joint factual background will set the stage.

## FACTUAL BACKGROUND

Plaintiffs William B. and Margaret B. are the parents of Wills.  (Pls.' Mot. for Summ. J., Statement of Material Fact No. 1, ECF No. 29; Defs.' Mot. for Summ. J., Undisputed Material Fact No. 1, ECF No. 28; Compl. ¶ 1, ECF No. 2.)  Margaret B. participated in the Plan through her employment with Sanofi-Aventis U.S. LLC, and Wills was a beneficiary of the Plan.  (Pls.' Mot. for Summ. J., Statement of Material Fact

No. 2, ECF No. 29; Defs.' Mot. for Summ. J., Undisputed Material Fact No. 2, ECF No. 28; Compl., ¶ 2, ECF No. 2.)

Wills was born in 1999; at eighteen months old his parents noticed him developing atypically. (Pls.' Mot. for Summ. J., Statement of Material Fact No. 12, ECF No. 29; AR 329, 547.) In October 2001, Wills had an MRI that revealed periventricular leukomalacia, a form of white matter brain injury; affected individuals generally exhibit developmental delays and often develop cerebral palsy or epilepsy later in life. (Pls.' Mot. for Summ. J., Statement of Material Fact No. 14, ECF No. 29; AR 549.) In November 2001, the Carolina Autism Research and Evaluation team diagnosed Wills with High Functioning Autism and Attention Deficit Hyperactivity Disorder, with tendencies of Obsessive Compulsive Disorder. (Pls.' Mot. for Summ. J., Statement of Material Fact No. 15, ECF No. 29; AR 549.) Wills received two years of Applied Behavioral Analysis ("ABA") therapy in his home for thirty to forty hours each week "to learn skills like looking, listening, requesting, and imitating, as well as reading, conversing, and understanding another's perspective." (Pls.' Mot. for Summ. J., Statement of Material Fact No. 16, ECF No. 29; AR 549.)

Wills performed well in his elementary education with the assistance of a full-time shadow and an individual education plan, but he still struggled with anxiety, ADHD, and staying focused. (Pls.' Mot. for Summ. J., Statement of Material Fact No. 17, ECF No. 29; AR 549–51.) Wills' behavioral problems worsened during middle and high school despite increases in medication and ongoing therapy. (Pls.' Mot. for Summ. J., Statement of Material Fact Nos. 18-19, ECF No. 29; AR 551–53.) In addition to Wills' inappropriate behavior at school, he became increasingly confrontational, with violent

outbursts, at home.  (Pls.' Mot. for Summ. J., Statement of Material Fact No. 20, ECF No. 29; AR 553.)

In 2015, despite attending a summer program and beginning school at a therapeutic boarding school, Wills' behavior worsened, and he received an emergency discharge following behavior that included hitting, kicking, and spitting in addition to threatening himself and others with physical violence.  (Pls.' Mot. for Summ. J., Statement of Material Fact No. 22-25, ECF No. 29; AR 553-55, 615, 656-661, 2183–84.)  At that point in Wills' development, he went to Elevations for Residential Treatment Services, and the Plan covered a portion of his care there.

"The Plan covers treatment for Mental or Nervous Disorders and Substance Abuse", including inpatient treatment, outpatient treatment, and partial hospitalization.  (Pls.' Mot. for Summ. J., Statement of Material Fact Nos. 9-10, ECF No. 29; Defs.' Mot. for Summ. J., Undisputed Material Fact Nos. 14 & 17, ECF No. 28; AR 119, 122, 133–34, 157–58, 222, 225, 236–37, 260–61.)  As noted above, the Plan only covers treatment it deems medically necessary.  The Plan also provides that

> **THE FACT THAT YOUR PROVIDER MAY PRESCRIBE, ORDER, RECOMMEND OR APPROVE A SERVICE OR SUPPLY DOES NOT, IN ITSELF, MAKE IT MEDICALLY NECESSARY AND APPROPRIATE FOR THE DIAGNOSIS AND TREATMENT OF AN ILLNESS OR INJURY OR MAKE IT AN ELIGIBLE MEDICAL EXPENSE.**

(Defs.' Mot. for Summ. J., Undisputed Material Fact No. 11, ECF No. 28; AR 141, 244 (emphasis in original).)

## DISCUSSION

### I.       Elevations Residential Treatment Center Claim

On September 22, 2015, Elevations Residential Treatment Center admitted Wills. (Pls.' Mot. for Summ. J., Statement of Material Fact No. 26, ECF No. 29; Defs.' Mot. for Summ. J., Undisputed Material Fact No. 28, ECF No. 28; AR 455, 489, 1101–05.) Upon admission, Elevations documented Wills as anxious, irritable, unkempt, somewhat depressed, unpleasant to be around, with impaired insight, needing redirection, and entertaining thoughts of injuring himself.  (Defs.' Mot. for Summ. J., Undisputed Material Fact No. 30, ECF No. 28; AR 453.)  On the positive side, the staff found him fully oriented, with clear and articulate speech, and denying hallucinations and suicidal or homicidal ideation.  (Defs.' Mot. for Summ. J., Undisputed Material Fact No. 31, ECF No. 28; AR 453.)

On September 23, 2015, Horizon approved Wills for seven days of treatment at Elevations.  (Defs.' Mot. for Summ. J., Undisputed Material Fact No. 32, ECF No. 28; AR 455–56.)  Wills spent five days in the acute care section of the facility and then transitioned to the Phase 2 program of individual and family therapy, residential treatment, continued medication management, behavior management, and sensory therapy.  (Pls.' Mot. for Summ. J., Statement of Material Fact No. 27, ECF No. 29; AR 555.)  On September 29, 2015, Horizon approved Wills' stay through October 3, 2015. (Defs.' Mot. for Summ. J., Undisputed Material Fact No. 33, ECF No. 28; AR 461–62.)

Horizon performed a concurrent review on October 5, 2015 that indicated Wills continued to pick at his face and arms, continued to be anxious and oppositional at times, was ruminative and rigid, and verbally yelled at and threatened staff when he did

9

not want to follow directions.  (Defs.' Mot. for Summ. J., Undisputed Material Fact No. 34, ECF No. 28; AR 464–65.)  The review also indicated Wills was working on behavior modification to extinguish his self-harm and physical aggression.  (Id.)  Horizon approved Wills' stay through October 14, 2015.  (Defs.' Mot. for Summ. J., Undisputed Material Fact No. 36, ECF No. 28; AR 468–76.)  On October 14, 2015, Horizon performed another concurrent review.  (Defs.' Mot. for Summ. J., Undisputed Material Fact No. 37, ECF No. 28; AR 477–79.)  Horizon noted that Wills had made progress as he had not required restraint since October 8 after making threats to staff and peers but that he continued to act somewhat guarded and show inappropriate social behavior. (Defs.' Mot. for Summ. J., Undisputed Material Fact Nos. 38 & 39, ECF No. 28; AR 478.)  Horizon subsequently authorized Wills' stay through October 21, 2015.  (Pls.' Mot. for Summ. J., Statement of Material Fact No. 34, ECF No. 29; Defs.' Mot. for Summ. J., Undisputed Material Fact No. 40, ECF No. 28; AR 480–81.)

Horizon conducted a final concurrent review on October 22, 2015.  (Defs.' Mot. for Summ. J., Undisputed Material Fact No. 41, ECF No. 28; AR 483–85.)  At the time, Wills had a visit with his mother and did not have any tantrums.  (Defs.' Mot. for Summ. J., Undisputed Material Fact No. 41, ECF No. 28; AR 484.)  Wills denied any suicidal ideation, homicidal ideation, and self-injurious behaviors.  (Id.)  In the prior four days he had one crying episode, but it did not escalate into a tantrum.  (Id.)  Wills' thought content was goal directed with no delusions, and staff reported his mood as an eight out of ten with a congruent affect.  (Id.)  The review indicated that Wills still had impaired insight, but he had made progress and was doing better in functioning without having tantrums, he appeared more polite, and he engaged in less irritable types of behaviors.

(Id.)  The review also indicated that Wills had not had any medication changes in the past week nor were any medication changes planned.  (Defs.' Mot. for Summ. J., Undisputed Material Fact No. 42, ECF No. 28; AR 485.)

Horizon then requested its peer advisor, Dr. Neerada Rao, M.D., Board Certified in Psychiatry, review the request for continued stay from October 22 forward.  (Defs.' Mot. for Summ. J., Undisputed Material Fact No. 43, ECF No. 28; AR 487–89.)  Dr. Rao reviewed Wills' medical records and conducted a peer to peer review with Craig Ramsey at Elevations regarding the issue of continued medical necessity for Wills' stay.  (Defs.' Mot. for Summ. J., Undisputed Material Fact No. 44, ECF No. 28; AR 487–89.)  Mr. Ramsey noted that Wills continued to get angry and had even threatened and spit on a staff member the night before; however, Mr. Ramsey also indicated that he understood that Wills' condition was chronic with periodic exacerbations and agreed that Wills no longer met medical necessity standards for continued stay at the residential treatment center.  (Defs.' Mot. for Summ. J., Undisputed Material Fact Nos. 44 & 45, ECF No. 28; AR 489.)  After informing Elevations of the denial, Mr. Ramsey indicated that Elevations did not wish to appeal the denial and turned the case over to Wills' treating therapist and psychiatrist.  (Defs.' Mot. for Summ. J., Undisputed Material Fact No. 46, ECF No. 28; AR 485.)

On October 23, 2015, Horizon sent a letter indicating it found Wills' stay at Elevations no longer medically necessary and denying further coverage.  (Pls.' Mot. for Summ. J., Statement of Material Fact No. 35, ECF No. 29; Defs.' Mot. for Summ. J., Undisputed Material Fact No. 47, ECF No. 28; AR 490–92.)  The letter explained that Elevations had admitted Wills due to aggressive and impulsive behavior, that Elevations

11

treated him with therapy and prescription medications, and that his symptoms had improved.  (Pls.' Mot. for Summ. J., Statement of Material Fact No. 36, ECF No. 29; Defs.' Mot. for Summ. J., Undisputed Material Fact No. 48, ECF No. 28; AR 490–91.) The letter noted that Wills was more cooperative and easily re-directable and that a visit with his mother had gone well.  (Id.)  The letter also indicated that as of October 22, Wills' incidents of aggression had decreased significantly; there were no self-harm behaviors; he learned new coping skills; and he was in touch with reality.  (Id.) Accordingly, the letter found continued residential treatment beyond October 22, 2015 not medically necessary and found that a less restrictive level of care, such as outpatient care, could safely meet Wills' needs.  (Id.)  Horizon's letter also noted that it based its medical necessity decision on the Beacon Health criteria 3.301 and the terms of the Plan.  (Pls.' Mot. for Summ. J., Statement of Material Fact No. 40, ECF No. 29; Defs.' Mot. for Summ. J., Undisputed Material Fact No. 49, ECF No. 28; AR 491.)

To determine whether certain care for Mental Disorders, such as residential treatment, is medically necessary, Horizon uses guidelines developed by Beacon Health Options.[4]  (Defs.' Mot. for Summ. J., Undisputed Material Fact No. 18, ECF No. 28; AR 307–15, 604–07, 1412–15.)  Beacon Health criteria 3.301 concerns Residential Treatment Services ("RTS") guidelines for children and adolescents and defines RTS as follows:

> Residential Treatment Services are provided to children/adolescents who require 24-hour treatment and supervision in a safe therapeutic environment.  RTS is a 24 hour a day/7 day a week facility-based level of care.  RTS provides individuals with severe and persistent psychiatric

---

[4] The Administrative Record also refers to the Beacon Health guidelines as the ValueOptions® guidelines.  The Court will refer to the guidelines as the Beacon Health guidelines.

12

disorders therapeutic intervention and specialized programming in a controlled environment with a high degree of supervision and structure. RTS address the identified problems through a wide range of diagnostic and treatment services, as well as through training in basic skills such as social skills and activities of daily living that cannot be provided in a community setting. The services are provided in the context of a comprehensive, multidisciplinary and individualized treatment plan that is frequently reviewed and updated based on the individual's clinical status and response to treatment. The therapies provided employ commonly accepted evidenced based treatment interventions such as CBT, DBT, Motivational Interviewing, MBCT (Mindfulness Based Cognitive Therapy[)], MBSR (Mindfulness Based Stress Reduction), RPT (Relapse Prevention Therapy), WRAP as examples where clinically indicated. *_This level of care requires at least weekly physician visits._* This treatment primarily provides social, psychosocial, education and rehabilitative training, and focuses on family or caregiver reintegration. Active family/caregiver involvement through family therapy is a key element of treatment and is required unless contraindicated. Discharge planning must begin at admission, including plans for reintegration into the home, school and community. If discharge to a home/family is not an option, alternative placement must be rapidly identified and there must be regular documentation of active efforts to secure such placement. Academic schooling is funded through the local school system in most States. The facility is expected to provide an environment and coordinate educational activities that are age appropriate. Licensure and credentialing requirements specific to facilities and individual practitioners do apply and are found in our provider manual/credentialing information.

(AR 604, 1412 (emphasis in original); Defs.' Reply, Resp. & Reply to Undisputed Material Fact No. 19, ECF No. 49.) The medical necessity guidelines for RTS include Admission Criteria, Continued Stay Criteria, and Discharge Criteria. (Defs.' Mot. for Summ. J., Undisputed Material Fact No. 20, ECF No. 28; AR 314–15, AR 604–07, AR 1412–15.) The Beacon Health Admission Criteria for children and adolescents provides that the beneficiary must meet all the following criteria for admission to RTS:

1. The child/adolescent demonstrates symptomology consistent with a DSM (the most current version of the DSM[)] diagnosis which requires, and can reasonably be expected to respond to, therapeutic intervention.

2. The child/adolescent is experiencing emotional or behavioral problems in the home, community and/or treatment setting and is not sufficiently

stable either emotionally or behaviorally, to be treated outside of a highly structured 24-hour therapeutic environment.

3. The child/adolescent demonstrates a capacity to respond favorably to rehabilitative counseling and training in areas such as problem solving, life skills development, and medication compliance training.

4. The child/adolescent may not be appropriate for a different level of care as evidenced by a recent inpatient stay with a history of poor treatment adherence or outcomes in the past, or a series of increasingly dangerous behaviors which present significant risk.  Failure at other levels of care is not required to meet admission criteria.

5. The family situation and functioning levels are such that the child/adolescent cannot safely remain in the home environment and receive community-based treatment.

(AR 604–05, 1412–13; Defs.' Reply, Resp. & Reply to Undisputed Material Fact No. 21, ECF No. 49.)  The child and adolescent guidelines also identify Continued Stay Criteria, all of which a beneficiary must meet for the Plan to cover the continued care:

1. The child/adolescent's condition continues to meet admission criteria at this level of care.

2. The child/adolescent's treatment does not require a more intensive level of care, and no less intensive level of care would be appropriate.

3. Treatment planning is individualized and appropriate to the individual's changing condition with realistic and specific goals and objectives stated.  Treatment planning must include active family or other support systems involvement, along with social, occupational and interpersonal assessment unless contraindicated.  The expected benefits from all relevant treatment modalities are documented.  The treatment plan has been implemented and updated, with consideration of all applicable and appropriate treatment modalities.  The treatment plan should clearly address the problem areas which led to the placement in RTC with measurable goals and interventions established and updated throughout the individual's RTC length of stay.

4. All services and treatment are carefully structured to achieve optimum results in the most time efficient manner possible consistent with sound clinical practice.

5. If treatment progress is not evident, then there is documentation of treatment plan adjustments to address such lack of progress and there is fair likelihood that the child/adolescent will demonstrate progress with these changes.

6. Care is rendered in a clinically appropriate manner and focused on the child/adolescent's behavioral and functional outcomes.  This includes addressing not only psychiatric, medical, family systems issues, but also educational and vocational issues.  The treatment planning should include all stakeholders in coordinating and planning the discharge and aftercare.

7. An individualized discharge plan has been developed which includes specific realistic, objective and measurable discharge criteria and plans for appropriate follow-up care.  A timeline for expected implementation and completion is in place but discharge criteria have not yet been met.

8. Child/adolescent is actively participating in treatment to the extent possible consistent with his/her condition, or there are active efforts being made that can reasonably be expected to lead to the child/adolescent's engagement in treatment.

9. Unless contraindicated, family, guardian, and/or custodian is actively involved in the treatment as required by the treatment plan, or there are active efforts being made and documented to involve them.  Beacon Health Options recommends at least 2 opportunities each week for family interaction.

10. When medically necessary, appropriate psychopharmacological intervention has been prescribed and/or evaluated and conforms to current practice standards.  In situations where pharmacologic interventions are outside of the standard the treating clinician provides justification to support medications chosen and a clear monitoring plan.

11. There is a documented active attempt at coordination of care with relevant outpatient providers and community support systems when appropriate.

(AR 605–07, 1413–15; Defs.' Reply, Resp. & Reply to Undisputed Material Fact No. 22, ECF No. 49.)  Lastly, the child and adolescent Discharge Criteria provide that a beneficiary must meet criteria 1, 2, 3, 4, or 5, in addition to meeting 6 and 7 prior to discharge from RTS:

1.  The child/adolescent's documented treatment plan goals and objectives have been substantially met and/or a safe, continuing care program can be arranged and deployed at an alternative level of care.

2.  The child/adolescent no longer meets admission criteria, or meets criteria for a less or more intensive level of care.

3.  The child/adolescent, family, guardian and/or custodian are competent but non-participatory in treatment or in following the program rules and regulations. There is non-participation of such a degree that treatment at this level of care is rendered ineffective or unsafe, despite multiple, documented attempts to address non participation issues.

4.  Consent for treatment is withdrawn, and it is determined that the child/adolescent or parent/guardian has the capacity to make an informed decision and does not meet criteria for an inpatient level of care.

5.  The child/adolescent is not making progress toward treatment goals despite persistent efforts to engage him/her, and there is no reasonable expectation of progress at this level of care nor is it required to maintain the current level of function.

6.  The child/adolescent can be safely treated in an alternative level of care.

7.  An individualized discharge plan with appropriate, realistic and timely follow-up care is in place.

(AR 607, 1415; Defs.' Reply, Resp. & Reply to Undisputed Material Fact No. 23, ECF No. 49; Pls.' Mot. for Summ. J., Statement of Material Fact No. 47, ECF No. 29.)

On October 22, 2015, knowing Horizon had denied the claim but prior to receiving the written explanation, Wills' parents appealed the denial, as was their right. (Defs.' Mot. for Summ. J., Undisputed Material Fact No. 50, ECF No. 28; AR 497–500.) The Plan provides the following process to appeal a claim denial:

If your claim is denied, you may appeal that decision. To appeal, you must submit a written request to the claims administrator within 180 days of receiving the initial claim denial. Along with the written request for appeal, you may submit any additional facts, documents or proof you believe will show why the claim should not be denied. If the written request for appeal

is not submitted within 180 days of receiving the initial claim denial, you lose the right to appeal under the Plan.

### a. *Pre-Service and Post-Service Claim Appeals*

You will be provided with written or electronic notification of the decision on your appeal as follows:

For appeals of Pre-Service Claims (as defined above), you will be notified by the claim administrator of the decision within 30 days from receipt of a request for appeal of a denied claim.

For appeals of Post-Service Claims (as defined above) and of denials of claims based on medically necessary treatments or experimental or investigational services (as defined in the applicable Attachments), the appeal will be conducted by the claims administrator and you will be notified by the claims administrator of the decision within 60 days from receipt of a request for appeal of a denied claim.

Please note that the claims administrator's decision is based only on whether or not benefits are available under the relevant Component Plan for the proposed treatment or procedure.  The determination as to whether the pending health service is necessary or appropriate is between you and your doctor.

(Pls.' Mot. for Summ. J., Statement of Material Fact No. 11, ECF No. 29; AR 31–32.)

Horizon requested a different peer advisor, Dr. Henry Odunlami, M.D., Board Certified in Psychiatry, review Wills' record on appeal and provide his opinion about the medical necessity of care beyond October 22.  (Defs.' Mot. for Summ. J., Undisputed Material Fact No. 51, ECF No. 28; AR 497–500.)  As part of his review, Dr. Odunlami reached out to speak to Gordon Day and Mark Rainsdon at Elevations regarding Wills' treatment, condition, and continued care.  (Defs.' Mot. for Summ. J., Undisputed Material Fact No. 53, ECF No. 28; AR 500.)  Dr. Odunlami noted that Wills had no suicidal ideation, homicidal ideation, self-injurious behavior, or hallucinations.  (Defs.' Mot. for Summ. J., Undisputed Material Fact No. 52, ECF No. 28; AR 500.)  He further indicated Wills had interactions with his mother without incident and reported his mood

as an eight out of ten.  (Id.)  Dr. Odunlami noted that Wills still exhibited some impaired insight, struggled socially with peers, and had been placed on a therapeutic hold three days earlier due to pushing and threatening staff; however, he indicated that, overall, the tantrums appeared to be decreasing and staff at Elevations felt like Wills was progressing.  (Id.)  Dr. Odunlami ultimately determined that as of October 22, 2015, Wills lacked significant psychological or medical problems requiring continued 24-hour care, and Wills could safely utilize a less intensive level of care such as a partial hospitalization program.  (Defs.' Mot. for Summ. J., Undisputed Material Fact No. 54, ECF No. 28; AR 497–500.)

Based on the record and opinions provided by Dr. Odunlami, Horizon concluded it had correctly determined that Wills no longer needed inpatient treatment at Elevations beyond October 22, 2015 and upheld its denial on appeal.  (Pls.' Mot. for Summ. J., Statement of Material Fact No. 37, ECF No. 29; Defs.' Mot. for Summ. J., Undisputed Material Fact No. 55, ECF No. 28; AR 501–03, 1183–85.)  Horizon notified the B. Plaintiffs of their decision in an October 29, 2015 letter indicated that Wills' symptoms and aggressiveness had improved, and he denied any intent to harm himself or others. (Pls.' Mot. for Summ. J., Statement of Material Fact No. 38, ECF No. 29; AR 501, 1183.) The letter further stated that as of October 22 Wills' symptoms did not require a setting with seven day a week treatment, and he could have accessed a less intensive level of care such as partial hospitalization.  (Id.)  The letter also indicated that Horizon based its denial on the Beacon Health guidelines 3.301 and the terms of the Plan.  (Pls.' Mot. for Summ. J., Statement of Material Fact No. 40, ECF No. 29; AR 502, 1184.)  In its denial letter, Horizon also informed Wills' parents that they could request an external

review by an Independent Review Organization ("IRO").  (Defs.' Mot. for Summ. J.,

Undisputed Material Fact No. 56, ECF No. 28; AR 502, 1184.)

The SPDs provide that if the member remains dissatisfied with the internal

appeal decision, the member has the right to pursue an external appeal with an

Independent Review Organization ("IRO").  (Defs.' Mot. for Summ. J., Undisputed

Material Fact No. 25, ECF No. 28; AR 197, 299.)  The member has four after receiving

the denial letter to bring that second appeal.  (AR 197, 299.)

After receiving the denial of their first appeal of the Elevations denial of coverage,

the B. Plaintiffs kept Wills at Elevations for continued treatment.  Wills continued

treatment at Elevations through his discharge on January 27, 2016.  (Pls.' Mot. for

Summ. J., Statement of Material Fact No. 31, ECF No. 29; Defs.' Mot. for Summ. J.,

Undisputed Material Fact No. 70, ECF No. 28; AR 511, 2072.)  Professionals from

Elevations completed an evaluation of Wills upon his discharge.  (AR 2072–2131.)

Wills' evaluation indicated that he had made "a strong level of therapeutic progress".

(Pls.' Mot. for Summ. J., Statement of Material Fact No. 28, ECF No. 29; AR 2109.)

Specifically, the evaluation stated that

> [h]e made progress in understanding, expressing and regulating his
> emotions.  He made progress in learning and using self-regulation
> strategies more independently.  His social skills improved and his ability to
> complete academic assignments improved.  *It is important to note that it
> required a very high level of structure, at least weekly medication
> management, individual therapy, and group therapy focused on specific skill
> building and daily problem solving, social skills training, and one on one
> assistance, cueing, mentoring, coaching and redirecting to gain this
> progress.*

(Pls.' Mot. for Summ. J., Statement of Material Fact No. 29, ECF No. 29; AR 2109

(emphasis in original).)  The evaluation further indicated:

> Upon his graduation from [Elevations], Wills had made great improvements but was still a young man at a very high level of risk.  Without continued residential treatment and a high level of therapeutic programming, he is at very high risk for returning to previous levels of emotional and behavioral dysregulation, aggressive tantrums, self harm and suicidal ideation.  His current struggles indicate the need for a well-structured therapeutic environment with a high level of individual support and one on one coaching and mentoring as needed.  Given the level of psychological distress he has experienced and the level of self-harm and agitation seen when he arrived he appears to be vulnerable to emotional distress.  His safety would be at risk if he were to not in [sic] residential treatment.  A very high level of residential therapeutic and academic support is needed.

(Pls.' Mot. for Summ. J., Statement of Material Fact No. 30, ECF No. 29; AR 2109.)

On April 25, 2016, Wills' parents requested an external review by an IRO.  (Pls.' Mot. for Summ. J., Statement of Material Fact No. 42, ECF No. 29; Defs.' Mot. for Summ. J., Undisputed Material Fact No. 57, ECF No. 28; AR 511–87.)  In the external review request Wills' parents argued that the denial rationale was flawed and not based on the Beacon Health guidelines that Horizon uses in making its determinations.  (Pls.' Mot. for Summ. J., Statement of Material Fact Nos. 43–46 & 48, ECF No. 29; Defs.' Mot. for Summ. J., Undisputed Material Fact No. 58, ECF No. 28; AR 511–87.)  With the external review request Wills' parents also submitted letters from various professionals in support of Wills' continued stay at Elevations, medical records relating to Wills' treatment history, and medical records from Wills' stay at Elevations.  (Pls.' Mot. for Summ. J., Statement of Material Fact No. 49, ECF No. 29; Defs.' Mot. for Summ. J., Undisputed Material Fact Nos. 59–61, ECF No. 28; AR 608–18, 632–1170.)

On September 9, 2016, Horizon provided the administrative record to MCMC, an IRO, to determine whether Wills' treatment at Elevations for October 22, 2015 and beyond was medically necessary under the terms of the Plan.  (Defs.' Mot. for Summ. J., Undisputed Material Fact No. 62, ECF No. 28; AR 1171–72.)  MCMC provided the

administrative record to a physician reviewer board certified in Psychiatry with a sub-certification in Child & Adolescent Psychiatry who served as attending staff psychiatrist at several hospitals and as a clinical Instructor.  (Defs.' Mot. for Summ. J., Undisputed Material Fact No. 63, ECF No. 28; AR 1181.)

According to the SPDs, "[t]he IRO is not bound by any decisions or conclusions that were reached during the internal appeals process," and "[i]f the [IRO's] decision is favorable to [the member], the Plan must pay benefits without delay even if it intends to seek other judicial remedies."  (Defs.' Mot. for Summ. J., Undisputed Material Fact Nos. 26 & 27, ECF No. 28; AR 198, 300.)  The SPDs state that the IRO's decision will be communicated within forty-five calendar days after receipt of the appeal.  (AR 198, 300.)

After reviewing the plan documents, medical necessity criteria, medical records, correspondence, and other information submitted and gathered, on October 24, 2016, the independent reviewer partially upheld and partially overturned Horizon's decision. (Pls.' Mot. for Summ. J., Statement of Material Fact No. 51, ECF No. 29; Defs.' Mot. for Summ. J., Undisputed Material Fact No. 64, ECF No. 28; AR 1173–80.)  The independent reviewer found residential treatment necessary from October 22, 2015 through December 15, 2015 but not medically necessary beyond that date.  (Pls.' Mot. for Summ. J., Statement of Material Fact Nos. 51 & 53, ECF No. 29; Defs.' Mot. for Summ. J., Undisputed Material Fact No. 65, ECF No. 28; AR 1179–80.)  According to the independent reviewer, Wills required residential treatment from October 22 to December 15 "due to his aggressiveness and inability to interact without aggression and violence.  He required the 24/7 programming and monitoring and there was not a less restrictive setting that could have safely and effectively treated him."  (Pls.' Mot. for

21

Summ. J., Statement of Material Fact No. 52, ECF No. 29; Defs.' Mot. for Summ. J.,

Undisputed Material Fact No. 66, ECF No. 28; AR 1180.)  The reviewer indicated,

however, that as of December 15, Wills

> had shown a "remarkable improvement."  His coping skills and social interaction skills and frustration tolerance skills were much better.  He could have been treated at a less intensive level of care from that time forward. He was remaining there for milieu therapy and to provide an environment for him as he waited for his next placement.

(Defs.' Mot. for Summ. J., Undisputed Material Fact No. 67, ECF No. 28; AR 1180.)

The independent reviewer further indicated that

> [t]he residential treatment from 12/15/2015 forward is not medically necessary.  It is no longer clinically appropriate in terms of intensity to treat him on a residential level of care as he has improved significantly.  It is the standard of care to lessen the intensity of treatment when the treatment needs to reduce.  This occurs as of 12/15/2015 forward in this case.  Prior to that date, from 10/22/2015 to 12/15/2015 the patient is requiring of 24/[7] staff support and the ability of the residential treatment to contain his assaultive behaviors.

(AR 1180; Pls.' Mot. for Summ. J., Statement of Material Fact No. 53, ECF No. 29;

Defs.' Mot. for Summ. J., Undisputed Material Fact No. 68, ECF No. 28.)  Based upon

the conclusion of the independent reviewer, Horizon overturned its denial and paid

benefits through December 15, 2015.  (Defs.' Mot. for Summ. J., Undisputed Material

Fact No. 69, ECF No. 28.)

### A.  Arbitrary and Capricious Review

As noted above, because the claims administrator has discretion to grant or deny

claims and appeals, the Court will generally review those decisions under an arbitrary

and capricious standard.  Firestone, 489 U.S. at 115.  However, even where plan

documents grant an administrator discretionary authority, the Court may apply the de

novo standard where certain "procedural irregularities in the administrator's

consideration of the benefits claim" exist.  LaAsmar, 605 F.3d at 797.  In particular, the

Tenth Circuit applies the de novo standard of review where the administrator either

failed to respond to an administrative appeal or did not respond to an appeal within the

timeframes prescribed by the plans and ERISA.  See Gilbertson v. Allied Signal, Inc.,

328 F.3d 625, 628–31 (10th Cir. 2003) (applying de novo standard where administrator

never decided the claimant's administrative appeal); Kellogg v. Metro. Life Ins. Co., 549

F.3d 818, 826–28 (10th Cir. 2008) (applying de novo standard where administrator

failed to respond to request for review of decision to deny benefits); LaAsmar, 605 F.3d

at 797–98 (applying de novo standard where decision on appeal issued 170 days after

review sought); Rasenack ex rel. Tribolet v. AIG Life Ins. Co., 585 F.3d 1311, 1318

(10th Cir. 2009) (applying de novo standard where administrator issued a decision

denying a claimant's administrative appeal after the claimant had already filed suit under

ERISA).

   As to the denial of benefits for the Elevations claim, the B. Plaintiffs initially

contended the nearly six-month delay on the IRO appeal entitles them to de novo

review of this decision.  (Pls.' Summ. J. Mot. 30, ECF No. 29.)  However, the B.

Plaintiffs explicitly withdrew any claim of procedural irregularities related to timing that

would justify application of a de novo standard of review in their Reply brief.  (Pls.' Reply

7-8, ECF No. 50).  In their Reply, the B. Plaintiffs argue instead that because the IRO

review refused to uphold part of Horizon's denial, the denial must lack factual support,

and thus was unreasonable and not entitled to deference.  (Pls.' Reply 7, ECF No. 50.)

In support, the B. Plaintiffs cite Lisa O. v. Blue Cross of Idaho Health Serv. Inc., No.

1:12-CV-00285-EJL, 2015 WL 3439847, at *8 (D. Idaho May 28, 2015) (unpublished). (Pls.' Reply 7, ECF No. 50.)

In Lisa O., the district judge applied an abuse of discretion standard but acknowledged procedural irregularities. 2015 WL 3439847, at *8. In that case, the court found the claims administrator failed to engage in a meaningful dialogue with the claimants because the denial contained a bare citation to a section of the plan that contained ambiguity. Id. The procedural irregularity factored into the court's decision about whether the decision met the abuse of discretion standard. The court did not perform a de novo review. See accord Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105, 115-17 (2008).

In this case, the B. Plaintiffs seek a de novo review relying on the fact that Horizon's own appeal process resulted in a partial overturning of the denial. (Pls.' Reply 7, ECF No. 50.) The Court does not find Horizon's adoption of the IRO's opinion indicative of a procedural irregularity. To the contrary, the Court finds Horizon's willingness to accept and comply with the IRO's opinion as indicative of good faith participation in the appeals process.

Therefore, the Court finds that Horizon substantially complied with the Plan and ERISA with respect to the Elevations claim, entitling Horizon and the Plan's decision to deference. Therefore, the Court will apply the arbitrary and capricious standard of review to the Elevations claim. Under the arbitrary and capricious standard, the Court "consider[s] only 'the arguments and evidence before the administrator at the time it [denied benefits]' and decide[s] . . . . whether substantial evidence supported [the] decision." Finley v. Hewlett-Packard Co. Employee Benefits Org. Income Prot. Plan,

379 F.3d 1168, 1176 (10th Cir. 2004) (quoting Sandoval v. Aetna Life & Cas. Ins. Co.,

967 F.2d 377, 380 & n.4 (10th Cir. 1992)) (omitting two other aspects of arbitrary and

capricious review not at issue in this case).  "The Administrator's decision need not be

the only logical one nor even the best one.  It need only be sufficiently supported by

facts within his knowledge to counter a claim that it was arbitrary and capricious.  The

decision will be upheld unless it is not grounded on any reasonable basis."  Id. (quoting

Kimber v. Thiokol Corp., 196 F.3d 1092, 1098 (10th Cir. 1999); see also Eugene S. v.

Horizon Blue Cross Blue Shield, 663 F.3d 1124, 1133-34 (10th Cir. 2011) (indicating

that an administrator's decision must be upheld where it is reasonable, made in good

faith, and based on substantial evidence in the record).

### B.  Substantial Evidence Supports Horizon's Decision to Deny Benefits for Wills' Treatment at Elevations Beyond December 15, 2015

The B. Plaintiffs ask the Court to reverse Horizon and the Plan's denial of

coverage for Will's treatment at Elevations from December 16, 2015 to January 27,

2016, because residential treatment was medically necessary through January 27,

2016.  (Pls.' Mot. for Summ. J. 20, 29-30, ECF No. 29.)  Horizon and the Plan, on the

other hand, argue that substantial evidence supports the decision to deny benefits

because the record shows that residential treatment was not medically necessary after

December 15, 2015, and that Wills could have been treated at a less restrictive level of

care from this time forward.  (Defs.' Mot. for Summ. J. 27–29, ECF No. 28.)  A plaintiff

challenging a benefits decision under 29 U.S.C. § 1132(a)(1)(B) bears the burden of

proving entitlement to benefits.  See Rasenack, 585 F.3d at 1324.  Thus, to prevail, the

B. Plaintiffs must show that Wills' continued treatment at Elevations beyond December 15, 2015 qualified as medically necessary under the Plan terms.

The Plan only pays for covered services that it deems medically necessary to diagnose and treat an injury or illness, including mental disorders.  (AR 141, 244.)  The Plan provides that treatment is medically necessary if a health care provider, exercising his or prudent clinical judgment, would provide such treatment for the purpose of evaluating, diagnosing, or treating an illness, injury, disease, or its symptoms and the treatment is (1) in accordance with generally accepted standards of medical practice, (2) appropriate in terms of type, frequency, extent, site, and duration, (3) effective for the illness or injury, (4) not primarily for the convenience of the person or the provider, and (5) not more costly than another service that would be likely to produce equivalent therapeutic results.  (AR 120, 223.)  To determine whether inpatient residential treatment services, such as Wills' stay at Elevations, qualify as medically necessary Horizon uses guidelines developed by Beacon Health Options, which set forth criteria for admission, continued stay, and discharge.  Horizon applied the Beacon Health guidelines, 3.301, for children and adolescents in determining whether Wills' continued treatment at Elevations was medically necessary.  The B. Plaintiffs agree that Horizon applied the proper criteria in this instance (see Pls.' Opp'n 10–11, ECF No. 48), but dispute the conclusion reached by Horizon.

Specifically, the B. Plaintiffs contend that the Elevations' denial focused on the absence of acute symptoms—like severe suicidal or homicidal behavior—to deny residential treatment when such symptoms would actually exclude Wills from eligibility for residential treatment under the Plan language.  (Pls.' Opp'n 12, ECF No. 48.)  This

denial based on an erroneous requirement, the B. Plaintiffs contend, qualifies as an arbitrary and capricious denial.  (Id.)  Horizon and the Plan contend they appropriately considered the risk of harm Wills posed to himself and others in assessing whether he needed residential treatment or whether a lower level of care, like partial hospitalization or outpatient treatment would suffice.  (Defs.' Reply 14-15, ECF No. 49.)

The record indicates that upon admission to Elevations on September 22, 2015, Wills was anxious, irritable, unkempt, somewhat depressed, unpleasant to be around, had impaired insight, had to be redirected, and reported having thoughts of injuring himself.  (AR 453.)  Through much of October 2015, Wills continued to be anxious and oppositional at times, showed inappropriate social behavior, and verbally yelled at and threatened staff.  (AR 464–65, 478.)  By October 22, 2015, Wills had made some progress, denying any suicidal ideation, homicidal ideation, and self-injurious behavior and was functioning better, appeared more polite, and able to engage in less irritable behaviors.  (AR 484.)  The IRO concluded that Wills required residential treatment from October 22 to December 15, 2015 "due to his aggressiveness and inability to interact without aggression and violence.  He required the 24/7 programming and monitoring and there was not a less restrictive setting that could have safely and effectively treated him."  (AR 1180.)  The reviewer further indicated, however, that as of December 15, Wills

> had shown a "remarkable improvement."  His coping skills and social interaction skills and frustration tolerance skills were much better.  He could have been treated at a less intensive level of care from that time forward. He was remaining there for milieu therapy and to provide an environment for him as he waited for his next placement.

(Id.)  Thus, the independent reviewer concluded that

[t]he residential treatment from 12/15/2015 forward is not medically necessary.  It is no longer clinically appropriate in terms of intensity to treat him on a residential level of care as he has improved significantly.  It is the standard of care to lessen the intensity of treatment when the treatment needs to reduce.  This occurs as of 12/15/2015 forward in this case.  Prior to that date, from 10/22/2015 to 12/15/2015 the patient is requiring of 24/[7] staff support and the ability of the residential treatment to contain his assaultive behaviors.

(Id.)

The medical records from Elevations from October 22, 2015 through December 15, 2015 support this conclusion.  (AR 1614–1782.)  They show that, through early December 2015, Wills displayed frequent and serious aggressive behaviors, including physical and verbal aggression toward Elevations staff, self-harm attempts, and tantrums.  (See id.)  For example, during just one week from October 22, 2015 to October 28, 2015 Wills was "[p]ut into three different therapeutic hold[s] . . . for endangerment towards staff and including his self, as well put on yellow zone for bullying and threatening staff."  (AR 1758.)  However, the records show improvement over this timeframe as well, particularly in December.  (AR 1614–1782.)  Various records from Elevations from mid-December 2015 forward note that Wills has achieved "remarkable improvement with emotional and behavioral regulation."  (See, e.g., AR 1570, 1580, 1595.)  The records from this timeframe do not reveal aggression toward staff or self-harm behaviors either.  (See AR 1485–1613.)  The record does not bear out the B. Plaintiffs' contention that the final Elevations denial focused on inappropriate criteria for a medical necessity decision concerning an RTS stay.

The B. Plaintiffs point to an evaluation from Elevations completed upon Wills' discharge, (AR 2072–2131), where Elevations recommends residential treatment, which the B. Plaintiffs claim makes the treatment medically necessary beyond December 15,

28

2015.  The evaluation indicated that Wills had made "a strong level of therapeutic

progress" while at Elevations but also stated that

> [u]pon his graduation from [Elevations], Wills had made great improvements
> but was still a young man at a very high level of risk.  Without continued
> residential treatment and a high level of therapeutic programming, he is at
> very high risk for returning to previous levels of emotional and behavioral
> dysregulation, aggressive tantrums, self harm and suicidal ideation.  His
> current struggles indicate the need for a well-structured therapeutic
> environment with a high level of individual support and one on one coaching
> and mentoring as needed.  Given the level of psychological distress he has
> experienced and the level of self-harm and agitation seen when he arrived,
> he appears to be vulnerable to emotional distress.  His safety would be at
> risk if he were to not in [sic] residential treatment.  A very high level of
> residential therapeutic and academic support is needed.

(AR 2109.)

While this evaluation supports the B. Plaintiffs' position, it does not demonstrate

that Horizon abused its discretion in finding residential treatment not medically

necessary after December 15, 2015.  Substantial evidence in the record—Wills' medical

records from Elevations and the external review from a doctor board certified in

psychology—support Horizon's conclusion that residential treatment was no longer

medically necessary after December 15, 2015.  These materials show that Wills

demonstrated remarkable improvement and no longer displayed the frequent and

serious aggressive behaviors that he had previously shown.

The Beacon Health criteria on which Horizon relied in determining medical

necessity for continued residential treatment indicate that such treatment is medically

necessary only if, among other things, "[t]he child/adolescent's condition continues to

meet admission criteria at this level of care," and "[t]he child/adolescent's treatment

does not require a more intensive level of care, and no less intensive level of care would

be appropriate."  (AR 605–07, 1413–15.) As noted above, the admission criteria require, among other things, that:

- "The child/adolescent is experiencing emotional or behavioral problems in the home, community and/or treatment setting and is not sufficiently stable either emotionally or behaviorally, to be treated outside of a highly structured 24-hour therapeutic environment."

- "The child/adolescent may not be appropriate for a different level of care as evidenced by a recent inpatient stay with a history of poor treatment adherence or outcomes in the past, or a series of increasingly dangerous behaviors which present significant risk.  Failure at other levels of care is not required to meet admission criteria."

- "The family situation and functioning levels are such that the child/adolescent cannot safely remain in the home environment and receive community-based treatment."

(AR 604–05, 1412–13.)  Substantial evidence in the record supports Horizon's determination that after December 15, 2015 Wills did not meet the criteria for continued admission at Elevations.  While Wills undoubtedly continued to have issues and face challenges after this date, the record shows that he had made "remarkable progress" by this time and no longer exhibited the frequent and serious aggressive behaviors that he had before his admission to Elevations and during the first few months of his stay. Further, as the independent external reviewer noted, while he needed twenty-four hour, seven-day a week treatment to control his aggressive behavior before December 15, 2015, when that aggressive behavior diminished, and he improved in general by December 15, 2015, such intense treatment was no longer required.  Because substantial evidence in the record indicates that Wills had improved significantly by December 15, 2015 and could be safely treated at a less intense level of care after that

30

time, the Court finds Horizon did not abuse its discretion by denying coverage for treatment at Elevations from December 16, 2015 to January 27, 2016.

## II.   HERITAGE SCHOOLS, INC.

On January 29, 2016, Wills went from Elevations to Heritage, another residential treatment center.  (Pls.' Mot. for Summ. J., Statement of Material Fact No. 32, ECF No. 29; Defs.' Mot. for Summ. J., Undisputed Material Fact No. 71, ECF No. 28; AR 2150.) The B. Plaintiffs sought coverage for this treatment as well.  Prior to making its decision Horizon conducted a concurrent review.  That February 2, 2016 review indicated that Wills was reportedly anxious but calm, with no suicidal ideation, homicidal ideation, psychosis, delusions, or hallucinations.  (Defs.' Mot. for Summ. J., Undisputed Material Fact No. 72, ECF No. 28; AR 1984.)  Wills reported being aware he lacked control over his anger and expressed concern about managing his behavior around kids his age. (Id.)  The review also stated that Wills displayed aggression towards staff while at Elevations and had a history of pushing, shoving, and throwing things.  (Defs.' Mot. for Summ. J., Undisputed Material Fact No. 73, ECF No. 28; AR 1984.)  The review further indicated that while guarded, Wills had not acted aggressively while at Heritage and had not said a lot to anyone.  (Defs.' Mot. for Summ. J., Undisputed Material Fact No. 74, ECF No. 28; AR 1984.)  The review noted that Wills had no history of suicide attempts, that his parents were supportive, and that currently he had no self-injurious behavior and was compliant with taking medications.  (Defs.' Mot. for Summ. J., Undisputed Material Fact No. 75, ECF No. 28; AR 1984.)

Subsequently, a Horizon doctor, Dr. Sydney Cohen, M.D., Board Certified in Psychiatry, conducted a peer review of the claim file.  (Defs.' Mot. for Summ. J.,

Undisputed Material Fact No. 78, ECF No. 28; AR 1990–94.)  Dr. Cohen spoke with

Melissa Timpson at Heritage to discuss Wills' symptoms and admission to Heritage.

(Id.)  Ms. Timpson reported that since his admission Wills had no suicidal or homicidal

ideation, had not engaged in self-injurious behavior, had not experienced psychosis,

and had not demonstrated any aggressive behavior.  (Defs.' Mot. for Summ. J.,

Undisputed Material Fact No. 78, ECF No. 28; AR 1994.)  Dr. Cohen concluded that

residential treatment was not medically necessary and that Wills could be treated

through outpatient care.  (AR 1994.)

In a letter dated February 4, 2016, Horizon denied coverage for all Wills'

treatment at Heritage.  (Pls.' Mot. for Summ. J., Statement of Material Fact No. 54, ECF

No. 29; Defs.' Mot. for Summ. J., Undisputed Material Fact No. 79, ECF No. 28; AR

1980–82, 1986–88.)  Horizon indicated that it denied Wills' claim for benefits for

Heritage because at admission he appeared calm and cooperative, not aggressive, and

without intent or plan to harm himself or others.  (Pls.' Mot. for Summ. J., Statement of

Material Fact No. 55, ECF No. 29; Defs.' Mot. for Summ. J., Undisputed Material Fact

No. 79, ECF No. 28; AR 1980–81, 1986–87.)  The letter further indicated that he was

cooperative with taking medications prescribed to treat his symptoms of anxiety,

depression, and aggressive behavior, had no serious medical symptoms, and could

provide for his self-care needs.  (Id.)  Therefore, the letter concluded that as of January

29, 2016, Horizon could not find residential mental health treatment medically

necessary, and outpatient mental health treatment could have provided the appropriate

level of care for Wills.  (Id.)  Horizon noted that it based its decision on the Beacon

Health criteria, 2.202.0 for Residential Treatment Services, and the terms of the Plan.

(Defs.' Mot. for Summ. J., Undisputed Material Fact No. 80, ECF No. 28; AR 1981, 1987.)

Beacon Health criteria, 2.202.0 for Residential Treatment Services is the general RTS guideline Horizon employs as opposed to the child and adolescent specific guideline it employed in the Elevations evaluation.  The Beacon Health criteria, 2.202.0, defines RTS as follows:

> Residential Treatment Services (also known as a Residential Treatment Center) are 24-hours, 7 days a week facility-based programs that provide individuals with severe and persistent psychiatric disorders therapeutic intervention and specialized programming, such as group, CBT, DBT and motivational interviewing, within a milieu with a high degree of supervision and structure and is intended for members who does [sic] not need the high level of physical security and frequency of psychiatric or medical intervention that are available on an inpatient unit.  In addition, the program provides individualized therapeutic treatment.  RTS is not an equivalent for long-term hospital care, rather, its design is to maintain the member in the least restrictive environment to allow for stabilization and integration. Consultations and psychological testing, as well as routine medical care, are included in the per diem rate.  RTS's [sic] serve members who have sufficient potential to respond to active treatment, need a protected and structured environment, and for whom outpatient, partial hospitalization, or acute hospital inpatient treatments are not appropriate.  RTS's [sic] are planned according to each member's needs and is [sic] generally completed in up to 14 days.  Realistic discharge goals should be set upon admission, and full participation in treatment by the member and his or her family members, as well as community-based treatment providers is expected when appropriate. [] Member's clinical condition warrants the evaluation of a physician on admission and weekly thereafter.

(Defs.' Mot. for Summ. J., Undisputed Material Fact No. 19, ECF No. 28; AR 314.)  The medical necessity guidelines for RTS include Admission Criteria, Continued Stay Criteria, and Discharge Criteria.  (Defs.' Mot. for Summ. J., Undisputed Material Fact No. 20, ECF No. 28; AR 314–15, AR 604–07, AR 1412–15.)  The Beacon Health Admission Criteria provide that a beneficiary must meet all the following criteria for admission to RTS:

1. DSM or corresponding ICD diagnosis and must have a mood, thought, or behavior disorder of such severity that there would be a danger to self or others if treated at a less restrictive level of care.

2. Member has sufficient cognitive capacity to respond to active acute and time-limited psychological treatment and intervention.

3. Severe deficit in ability to perform self-care activity is present (i.e. self-neglect with inability to provide for self at a lower level of care).

4. Member has poor to fair community supports sufficient to maintain him/her within the community with treatment at a lower level of care.

5. Member requires a time-limited period for stabilization and community reintegration.

6. When appropriate, family/guardian/caregiver agree to participate actively in treatment as a condition of admission.

7. Member's behavior or symptoms, as evidenced by the initial assessment and treatment plan, are likely to respond to or are responding to active treatment.

(Defs.' Mot. for Summ. J., Undisputed Material Fact No. 21, ECF No. 28; AR 314.)

On May 17, 2016, following the initial denial, Heritage, as opposed to the B. Plaintiffs, appealed the denial.  (Pls.' Mot. for Summ. J., Statement of Material Fact No. 57, ECF No. 29; Defs.' Mot. for Summ. J., Undisputed Material Fact No. 81, ECF No. 28; AR 1996, 2891.)  The SPDs provide that "[a] Covered Person (or a Provider or authorized representative acting on behalf of the Covered Person and with his/her consent) may appeal Adverse Benefit Determinations."  (AR 196; 298.)  The SPDs indicate that the Third-Party Claims Administrator will decide the appeal within thirty calendar days of receipt.  (AR 197, 299.)

Horizon assigned the case to Henry Odunlami, M.D., Board Certified in Psychiatry, to review the medical records submitted with the provider appeal.  (Defs.' Mot. for Summ. J., Undisputed Material Fact No. 82, ECF No. 28; AR 1996–99.)  Based

34

on his review dated June 6, 2016, Dr. Odunlami noted that Wills suffered no medical

issues, and that while he had a history of physical aggression, he had not demonstrated

that physical aggression while at Heritage.  (Defs.' Mot. for Summ. J., Undisputed

Material Fact No. 83, ECF No. 28; AR 1999.)  He also indicated that upon admission

Wills did not have suicidal or homicidal ideation or psychosis and was not engaged in

any self-injurious behaviors.  (Id.)  Dr. Odunlami concluded that no significant

psychological or medical problems existed that required 24-hour care and that an

outpatient facility could have safely treated Wills.  (Defs.' Mot. for Summ. J., Undisputed

Material Fact No. 84, ECF No. 28; AR 1999.)  Dr. Odunlami's review indicates that it

relates to a level one appeal.  (AR 1996–99.)

        In a letter dated June 14, 2016, Horizon notified Wills' parents and Heritage that

it did not authorize treatment at Heritage.  (Pls.' Mot. for Summ. J., Statement of

Material Fact No. 56, ECF No. 29; Defs.' Mot. for Summ. J., Undisputed Material Fact

No. 85, ECF No. 28; AR 2000–02.)  The letter indicated that as of January 29, Wills'

"symptoms no longer required the intensity of care provided by a residential mental

health treatment program" and that he "could have been safely treated in a less

restrictive level of care such as, outpatient mental health treatment services."  (Pls.' Mot.

for Summ. J., Statement of Material Fact No. 58, ECF No. 29; AR 2000.)  The letter

states that, again, Horizon based its decision on the Beacon Health criteria, 2.202.0 for

Residential Treatment Services and the terms of the Plan.  (Pls.' Mot. for Summ. J.,

Statement of Material Fact No. 59, ECF No. 29; AR 2001.)  The letter does not claim to

respond to Heritage's appeal and indicates that the B. Plaintiffs may appeal the

decision.  (AR 2000–02.)

By contrast, when Horizon denied the B. Plaintiffs' Level 1 appeal of the denial of the Elevations' care the first line of the letter specifically stated:  "Your request for a Level 1 appeal has been received by Horizon Blue Cross Blue Shield of New Jersey's Behavioral Health program."  (AR 1183.)  Further the letter explained that if the B. Plaintiffs remained dissatisfied with the result, they could request an external review by an IRO.  (AR 1184.)  Thus, the June 14, 2016 letter read very much like the February 4, 2016 letter, which previously denied the request for coverage of treatment at Heritage and not like a denial of a Level 1 appeal.  (C.f. AR 1986-88 with AR 2000-02.)

Hence on August 1, 2016, Wills' parents submitted what they considered a Level 1 appeal.  (Pls.' Mot. for Summ. J., Statement of Material Fact No. 63, ECF No. 29; Defs.' Mot. for Summ. J., Undisputed Material Fact No. 86, ECF No. 28; AR 2006–42.) The letter refers to an October 29, 2015 letter denying treatment at Heritage (AR 2006), as well as February 4, 2016 and June 14, 2016 denial letters.  (Defs.' Mot. for Summ. J., Undisputed Material Fact No. 87, ECF No. 28; AR 2006–07.)  Wills' parents argued that Horizon failed to comply with the claims procedures required by ERISA, that the 2.202.0 criteria conflicts with medically necessary treatment, and that the medical record contradicts each basis for denial in the February and June letters.  (Pls.' Mot. for Summ. J., Statement of Material Fact Nos. 64–66, ECF No. 29; Defs.' Mot. for Summ. J., Undisputed Material Fact No. 88, ECF No. 28; AR 2007–21.)  Wills' parents also summarized Wills' medical records, which they argued demonstrated his continued need for residential treatment.  (Pls.' Mot. for Summ. J., Statement of Material Fact No. 67, ECF No. 29; Defs.' Mot. for Summ. J., Undisputed Material Fact No. 89, ECF No. 28; AR 2021–42.)

36

On September 14, 2016, Horizon submitted Wills' claim file concerning Heritage to MCMC, an independent review organization, the normal procedure for a Level 2/IRO appeal.  (Defs.' Mot. for Summ. J., Undisputed Material Fact No. 90, ECF No. 28; AR 2886.)  On October 25, 2016, MCMC sent its IRO appeal decision upholding the denial of coverage to the B. Plaintiffs.  (AR 2885-893.)  MCMC employed a physician, board certified in psychiatry, with a sub-certification in child and adolescent psychiatry, to conduct the review.  (Defs.' Mot. for Summ. J., Undisputed Material Fact No. 91, ECF No. 28; AR 2893.)  That physician reviewed the appeal letter, denial letter, correspondence, medical records, and the SPD, and summarized and cited certain correspondence and medical records from the file.  (Defs.' Mot. for Summ. J., Undisputed Material Fact No. 92, ECF No. 28; AR 2887–91.)  The reviewer indicated that Wills' treatment at Heritage was

> not medically necessary because it is not clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for the Covered Person's illness, injury or disease; the patient has an autistic spectrum disorder.  Applied Behavioral Analysis (ABA) therapy is the recognized treatment of choice which can be provided in home and school and community settings.  The use of residential treatment is not indicated in this case, particularly as the patient was at a previous residential program and his acute symptoms stabilized.  He can be treated in a less intensive community based setting utilizing alternative/therapeutic educational settings, ABA therapy in home and at school.  This less intensive approach is at least as likely to produce effective treatment results, so the residential program cannot be established as medically necessary.

(Defs.' Mot. for Summ. J., Undisputed Material Fact No. 93, ECF No. 28; AR 2892.)  The external review identified an incorrect discharge date from Heritage of March 14, 2016.  (Pls.' Mot. for Summ. J., Statement of Material Fact No. 69, ECF No. 29; AR 2891.)  Nonetheless, the reviewer, in upholding the denial, considered Heritage's treatment records for Wills through the end of April 2016.  (AR 2890.)  The letter

37

indicates that the denial represents the end of the appeals process but that the recipient

may be able to file a lawsuit.  (AR 2886.)  Heritage did not discharge Wills until

December 16, 2016.  (Pls.' Reply, Resp. & Reply to Statement of Material Fact No. 33,

ECF No. 50; Defs.' Mem. in Opp'n to Pls.' Mot. for Summ. J. ("Defs.' Opp'n") 30, ECF

No. 47.)

On December 29, 2017, the B. Plaintiffs filed this action.  (Pls.' Mot. for Summ.

J., Statement of Material Fact No. 70, ECF No. 29; Defs.' Mot. for Summ. J., Undisputed

Material Fact No. 94, ECF No. 28; Compl., ECF No. 2.)  On January 2, 2018, counsel

mailed the Notice of Lawsuit and Request to Waive Service, together with the

Complaint, to Horizon.  (Pls.' Mot. for Summ. J., Statement of Material Fact No. 71, ECF

No. 29; Decl. of Kit Spencer & Ex. A, ECF No. 29-1.)  On January 8, 2018, Horizon

signed for the Complaint and the Notice of Lawsuit and Request to Waive Service.

(Pls.' Mot. for Summ. J., Statement of Material Fact No. 72, ECF No. 29; Decl. of Kit

Spencer & Ex. A, ECF No. 29-1.)  On January 9, 2018, Horizon sent a denial letter

indicating that it responded to Wills' Level 1 appeal of the Heritage denial.  (Pls.' Mot. for

Summ. J., Statement of Material Fact No. 73, ECF No. 29; AR 2895–97.)  The letter

contains similar language to the June 14, 2016 denial letter indicating that Dr. Odunlami

reviewed the request and determined that residential mental health treatment was no

longer medically necessary under the Beacon Health Criteria 2.202.0.  (Compare AR

2895–96 with AR 2000–02.)  The justification given for the denial also contained similar

reasoning and language to that provided in the June 14 letter with the exception of

stating that the B. Plaintiffs "have now exhausted all appeal levels available to you

through your organization".  (Id.)

## A.  Arbitrary and Capricious Standard

As discussed above, because the claims administrator has discretion to grant or deny claims and appeals, the Court will generally review those decisions under an arbitrary and capricious standard.  Firestone, 489 U.S. at 115.  However, even where plan documents grant the administrator discretionary authority, the Court may apply the de novo standard where procedural irregularities draw the administrator's actions into question.  LaAsmar, 605 F.3d at 797.  Specifically, the Tenth Circuit applies the de novo standard of review where the administrator either failed to respond to an administrative appeal or did not respond to an appeal within the timeframes prescribed by the plans and ERISA.  See LaAsmar, 605 F.3d at 797–98 (applying de novo standard where decision on appeal issued 170 days after review sought); Rasenack, 585 F.3d at 1318 (applying de novo standard where administrator issued a decision denying a claimant's administrative appeal after the claimant had already filed suit under ERISA).

But where an administrator with discretion substantially complies with the regulations, the Tenth Circuit has granted the administrator arbitrary and capricious review because a "hair-trigger rule" requiring strict compliance "could inhibit collection of useful evidence and create perverse incentives for the parties."  Gilbertson, 328 F.3d at 635.  The Tenth Circuit explained that "ERISA's procedural regulations are meant to promote accurate, cooperative, and reasonably speedy decision-making, not to generate an endless stream of business for employment lawyers."  Id.  "Thus, in the context of an ongoing, good faith exchange of information between the administrator and the claimant, inconsequential violations of the deadlines or other procedural irregularities would not entitle the claimant to de novo review."  Id.  Specifically, the

Tenth Circuit has held that an "administrator is in substantial compliance with a deadline if the delay is:  '(1) inconsequential; and (2) in the context of an on-going, good-faith exchange of information between the administrator and the claimant.' " Rasenack, 585 F.3d at 1317 (quoting Finley, 379 F.3d at 1173-74).

With respect to the Heritage claim, the B. Plaintiffs argue that the de novo standard of review should apply because Horizon did not respond to their August 1, 2016 level one internal appeal until January 9, 2018—after the B. Plaintiffs filed this lawsuit on December 29, 2017 and over 500 days after they lodged their appeal.  (Pls.' Mot. for Summ. J. 16–20, ECF No. 29; Pls.' Reply 7–8, ECF No. 50; Pls.' Opp'n 9, ECF No. 48.)  At oral argument, the B. Plaintiffs clarified their position that the Plan offers two parallel appeal tracks, one for the provider and one for the beneficiary.  (See Pls.' Reply 7–8, ECF No. 50.)

Horizon maintains that the arbitrary and capricious standard should apply. (Defs.' Reply 10–12, ECF No. 49; Defs.' Opp'n 23–26, ECF No. 47.)  Horizon claims that its June 14, 2016 letter is the denial of the Level 1 appeal made by the provider even though the letter does not indicate as much.  (Id.)  Horizon further asserts that it treated the August 1, 2016 letter sent by Wills' parents as a request for an external independent review since it had completed the Level 1 internal appeal already, and that it undertook such an external review in response.  (Id.)  Finally, Horizon argues that it did not need to send the denial letter it did after the filing of this lawsuit and that it sent the letter in error given that it already had completed the level one appeal.  (Id.)  In sum, Horizon argues that it substantially complied with the Plan and ERISA and that the

denial of the Heritage claim received the two levels of reviews available under the Plan.
(Id.)

Confusion undoubtedly occurred on both sides with respect to the appeal on the
Heritage claim.  The June 14, 2016 letter that addressed the Level 1 internal appeal
initiated by the provider, Heritage, did not indicate that it was a denial of that appeal.
(See AR 2000–02.)  Instead, it read like an initial denial letter and stated that the denial
could be appealed.  (See id.)  In light of this letter, Wills' parents submitted what they
considered a Level 1 internal appeal.  (AR 2006–42.)  After receiving this letter, Horizon
had an independent organization review the claim (AR 2885–93), which supports its
argument that it treated the letter from Wills' parents as a request for an external
independent review or Level 2 appeal.  Nonetheless, after the B. Plaintiffs filed this
lawsuit, Horizon confusingly sent a letter purporting to deny the Level 1 internal appeal
started by the B. Plaintiffs' August 1, 2016 letter.  (AR 2895–97.)  Horizon now
maintains, however, that it sent this letter in error.

Despite the confusion and errors that occurred with respect to the Heritage
appeals, the fact remains that Horizon's denial of the claim received the two levels of
review provided for in the Plan.  The Plan allows either the provider or member to first
appeal a denial, and then if Horizon upholds such an appeal internally, permits the
member to seek an external review from an independent reviewer.  (See AR 196–97,
298–99.)  The Plan does not provide for a two-tiered system allowing both the provider
and member to seek an internal review and external review separately, which would in
essence allow four appeals.  (See, e.g., AR 196, 298 ("A Covered Person (or a Provider
or authorized representative acting on behalf of the Covered Person and with his/her

consent) may appeal Adverse Benefit Determinations."  (emphasis added)); AR 197,

299 (indicating that "[the member] or the Provider can further appeal the decision within

one year after receiving the denial letter" (emphasis added).)

Here, on May 17, 2016, the provider, Heritage, appealed the initial denial,

exercising the sole opportunity to appeal the denial internally.  (AR 1996, 2891.)  On

June 14, 2016, Horizon responded to that appeal, even if the form of the letter sent

upholding the decision inaccurately stated that Heritage could internally appeal that

denial.  At this point, Horizon met the time requirements.  The August 1, 2016 letter sent

by Wills' parents then triggered the external independent review; indeed, the parties do

not point to any other letter or request that would have triggered the external review.

Horizon then conducted that external review, which upheld the denial.  Horizon notified

the B. Plaintiffs of the denial on October 25, 2016.  (AR 2885-893.)  The SPDs state that

the IRO's decision will be communicated within forty-five calendar days after receipt of

the appeal.  (AR 198, 300.)  Accepting Horizon and the Plan's arguments about one

internal review process, Horizon nonetheless took approximately eighty-five days to

respond to the Level 2 appeal.  Horizon therefore failed to comply with certain timing

requirements for review under the Plan but contends any delays were de minimis and

inconsequential.  (Defs.' Opp'n 24-25, ECF No. 47.)

The Court agrees.  Horizon conducted internal and external reviews of the initial

denial of benefits without unreasonable delay.  Because the denial of the Heritage claim

received the multiple level of reviews provided for in the Plan within reasonable

timeframes, the Court finds that Horizon substantially complied with the Plan and

ERISA.  Horizon communicated with the B. Plaintiffs about its actions and decisions

throughout the process.  Accordingly, the Court accords Horizon and the Plan's decision deference and applies the arbitrary and capricious standard of review to this claim as well.

The B. Plaintiffs also contend that Horizon's application of the wrong Beacon Health criteria to the Heritage claim, waives any entitlement to deference and warrants de novo review.  (Pls.' Opp'n to Defs.' Mot. for Summ. J. & Mem. in Support ("Pls.' Opp'n") 10–12, ECF No. 48.)  The B. Plaintiffs cite no case law from the Tenth Circuit to support their position that these flaws somehow alter the standard of review.  Rather, the cases they do cite in support of their argument apply an arbitrary and capricious standard of review.  Owings v. United of Omaha Life Ins. Co., 873 F.3d 1206, 1208 (10th Cir. 2017); Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co., 491 F.3d 1180, 1193 (10th Cir. 2007).  In both cases, the courts found denial of benefits in a manner inconsistent with the plan language arbitrary and capricious.  Owings, 873 F.3d at 1213; Flinders, 491 F.3d at 1193-94.  Inaccurate application of the plan does not qualify as a procedural irregularity affecting the standard of review.  Instead, these cases teach that inaccurate application of the plan constitutes a substantive issue for the court to address on the merits, rather than in the standard of review.  Thus the Court turns to the merits of the Heritage denial.

**B.    Substantial Evidence Supports Horizon's Decision to Deny Benefits for Wills' Treatment at Heritage**

The B. Plaintiffs ask the Court to reverse Horizon and the Plan's decision to deny coverage at Heritage from January 29, 2016 to December 16, 2016.  (Pls.' Mot. for Summ. J. 20, ECF No. 29.)  The parties make similar medical necessity arguments with respect to Horizon's decision to deny benefits for Heritage as they did with its decision

to deny benefits at Elevations after December 15, 2015.  (Pls.' Mot. for Summ. J. 20–30, ECF No. 29; Defs.' Mot. for Summ. J. 27–32, ECF No. 28.)  The B. Plaintiffs also argue that in denying coverage, Horizon acted arbitrarily and capriciously when it applied the general Beacon Health criteria, 2.202.0, for residential treatment as opposed to the criteria for children and adolescents.  (Pls.' Opp'n 10–11, 14–15, ECF No. 48; Pls.' Reply 14–15, ECF No. 50.)

A plaintiff challenging a benefits decision under 29 U.S.C. § 1132(a)(1)(B) bears the burden of proving entitlement to benefits.  See Rasenack, 585 F.3d at 1324.  Thus, to prevail, the B. Plaintiffs must show that Wills' continued treatment at Heritage from January 29, 2016 forward qualified as medically necessary under the Plan terms.

The record indicates that upon admission to Heritage, Wills was anxious but calm, with no suicidal ideation, homicidal ideation, psychosis, delusions, or hallucinations.  (AR 1984.)  He also had no current self-injurious behavior and was compliant with taking medications.  (Id.)  Further, while guarded, Wills had not been aggressive since his admission to Heritage.  (Id.)  Horizon had a doctor board certified in psychiatry conduct a review of Wills' claim file.  (AR 1990–94.)  The doctor concluded that residential treatment was not medically necessary and that Wills could be treated through outpatient care.  (AR 1994.)  Accordingly, Horizon denied coverage for Wills' treatment at Heritage from his admission on January 29, 2016 forward.  (AR 1980–82, 1986–88.)  Horizon's letter indicated that it denied the claim because at admission Wills was calm and cooperative, not aggressive, and without intent or plan to harm himself or others.  (AR 1980–81, 1986–87.)

44

After Heritage appealed the denial of benefits, (AR 1996, 2891), Horizon had a doctor board certified in psychiatry review the medical records submitted with the appeal.  (AR 1996–99.)  This doctor concluded that no significant psychological or medical problems existed that required twenty-four-hour care and that Wills could have been safely treated in an outpatient level of care.  (AR 1999.)  Following the B. Plaintiffs' appeal Horizon submitted Wills' claim file concerning Heritage to an independent reviewer.  (AR 2885–93.)  A physician board certified in psychiatry, with a sub-certification in child and adolescent psychiatry conducted the review.  (AR 2893.)  That reviewer indicated that Wills' treatment at Heritage was not medically necessary because Applied Behavioral Analysis (ABA) therapy provided in home and school was the "recognized treatment of choice" particularly given Wills' stabilization following his treatment at Elevations.  (AR 2892.)

The B. Plaintiffs argue that Horizon improperly relied on the lack of acute symptoms such as suicidal ideation in denying coverage for the Heritage claim.  (Pls.' Opp'n 12–15, ECF No. 48.)  This argument lacks merit.  Assessing whether Wills exhibited suicidal ideation and self-harm behaviors is appropriate in determining whether residential treatment was medically necessary, particularly given that Wills exhibited such symptoms when he entered Elevations.  Further, while Horizon considered the fact that Wills did not demonstrate suicidal ideation or exhibit self-harm behaviors at Heritage, this absence does not supply the sole reason for Horizon's decision.  Horizon determined that that factor, along with others including that Wills was cooperative and not aggressive when admitted to Heritage, demonstrated that Wills did not require twenty-four-hour a day, seven-day a week care at a residential treatment

center and that he could receive treatment at a less intensive level of care.  Assessing the presence or absence of acute symptoms was not improper.

The medical records from Heritage are consistent with the conclusions reached by the medical professionals who reviewed Wills' claim file.  (AR 2676–2884.)  The records show that Wills did not have any suicidal ideation or self-harm behaviors.  (See id.)  Further, Wills was largely cooperative and, with a few exceptions over his almost eleven-month stay at Heritage (AR 2788–90, 2875–77), did not display the aggressive behavior that he had exhibited before his admission to Elevations and during the first few months of his stay there.  (See AR 2676–2884.)

The B. Plaintiffs argue that Horizon improperly applied the general Beacon Health criteria in determining medical necessity as opposed to the criteria specific to children and adolescents.  The B. Plaintiffs claim that application of the criteria specific to children and adolescents would have changed Horizon's decision to deny benefits because the adult criteria have time frames not included in the child and adolescent criteria, fail to address the educational requirements, and include a different level of risky behavior.  (See Pls.' Opp'n 10–11, 14–15, ECF No. 48; Pls.' Reply 14–15, ECF No. 50.)  Nonetheless, both sets of criteria provide that admission to residential treatment is not medically necessary if the individual can be treated at a lower level of care.  The multiple medical professionals who reviewed Wills' case file concluded that he could be safely treated at a lower level of care.  The Beacon Health criteria on which Horizon relied in determining medical necessity for admission to residential treatment initially and at the Level 1 appeal indicate that such treatment is medically necessary only if the individual could not be treated at a lower level of care.  (See AR 314 (Criteria

46

1 – behavior of "such severity that there would be a danger to self or others if treated at a less restrictive level of care"; Criteria 3 – "inability to provide for self at lower level of care"; Criteria 4 – community supports insufficient to "maintain him/her within the community with treatment at a lower level of care")).  While worded differently, the Beacon Health criteria specific to children and adolescents contain similar criteria, providing in essence that residential treatment is necessary only where the child or adolescent cannot be treated at a lower level of care.  (See AR 604–05, 1412–13 (Criteria 2 – child/adolescent not emotionally or behaviorally stable enough "to be treated outside of a highly structure 24-hour therapeutic environment"; Criteria 4 – "child/adolescent may not be appropriate for a different level of care as evidenced by a recent inpatient stay with a history of poor treatment adherence or outcomes in the past, or a series of increasingly dangerous behaviors with present significant risk"; Criteria 5 – "family situation and function levels are such that the child/adolescent cannot safely remain in the home environment and receive community-based treatment")).

Horizon should have applied the Beacon Health criteria applicable to children and adolescents.  However, after the initial denial and the denial of the Level 1 appeal applying the incorrect criteria, Horizon sent the Level 2 appeal out to an IRO.  The IRO employed a physician board certified in psychiatry, with a sub-certification in child and adolescent psychiatry.  (AR 2893.)  That physician applied the Plan criteria for medical necessity and consulted sources other than the Beacon Health criteria to make his decision.  (AR 2892-93.)  Thus any error committed in the initial denial and Level 1 appeal by applying the wrong Beacon Health criteria was eliminated by the IRO applying the Plan criteria and generally accepted standards of medical practice directly.

Under the arbitrary and capricious standard, substantial evidence in the record supports the finding that Wills could have been safely treated at a lower level of care after December 15, 2015.  Thus, the Court finds Horizon did not abuse its discretion by denying coverage for treatment at Heritage from January 29, 2015 to December 16, 2016.

## **CONCLUSION**

For the foregoing reasons, the Court DENIES the B. Plaintiffs' Motion for Summary Judgment (ECF No. 29) and GRANTS Horizon and the Plan's Motion for Summary Judgment (ECF No. 28).

DATED this 20th day of April 2020.

BY THE COURT:

EVELYN J. FURSE
United States Magistrate Judge

48